**SO ORDERED.**

**SIGNED this 27 day of August, 2013.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

ERIK C. VANWART                                         CASE NO. 13-00515-8-SWH
CRISTIN N. VANWART,
                                                        CHAPTER 7
    DEBTORS.

### ORDER

The matter before the court is the trustee's objection to exemption claimed by the chapter 7 debtors. A hearing was held in Wilmington, North Carolina on July 16, 2013.

The debtors filed a voluntary petition under chapter 7 of the Bankruptcy Code on January 25, 2013. The case was determined to be a no asset case and the trustee entered his report of no distribution on March 27, 2013. The debtors received their discharge on May 6, 2013, and the case was closed. The debtors subsequently disclosed to the trustee a $25,000 payment received as part of a settlement agreement between the Federal Reserve and SunTrust Mortgage Inc. ("SunTrust Mortgage"). After discussion with the trustee and upon his advice, the debtors amended their schedules and exemptions to reflect the payment. The debtors' amended claim of exemptions exempts the payment as related to a "potential wrongful foreclosure claim against SunTrust

1

Mortgage," pursuant to the homestead exemption of N.C.G.S. § 1C-1601(a)(1) and the personal injury exemption of N.C.G.S. § 1C-1601(a)(8). On May 22, 2013, the trustee moved to reopen the case in order to administer the $25,000 payment, which he considers to be an asset of the estate. Filed with the motion was the trustee's objection to the exemptions claimed by the debtor related to this payment.

On their amended schedule C, the debtors dispute that the payment is property of the estate, and assert that they made the disclosure/amendment pursuant to direction from the trustee. Their contention that the payment is not property of the estate is based on the debtors' assertion that the interest in the payment vested postpetition, and that for that reason, the payment does not resolve any claim that the debtors held prepetition.

At the July 16 hearing, the parties agreed that the court should resolve the threshold question of whether the payment is property of the estate before addressing the question of whether the exemption was proper. As the issue involves the question of whether the payment implicated a prepetition interest of the debtor in property, a detailed recitation and examination of relevant dates and events, in both the debtors' case and the settlement between the Board of Governors of the Federal Reserve System (the "Federal Reserve") and SunTrust Mortgage which prompted the payment, is warranted and set forth below.

## BACKGROUND

On September 17, 2009, SunTrust Mortgage initiated an action (the "first foreclosure action") in New Hanover County to foreclose on the debtors' property at 3825 Sweetbriar Road, Wilmington, North Carolina. That foreclosure action was voluntarily dismissed without prejudice on December 14, 2009.

Meanwhile, the Federal Reserve had initiated an enforcement action (the "enforcement action") against SunTrust Banks, Inc., SunTrust Bank (the "Bank"), SunTrust Mortgage, (collectively the "SunTrust entities") for alleged deficient practices in mortgage loan servicing and foreclosure processing. On April 13, 2011, the SunTrust entities and the Federal Reserve entered into a consent order (the "2011 consent order). In re SunTrust Banks, Inc., SunTrust Bank, and Suntrust Mortgage, Inc., Docket No. 11-021-B-HC/SM/DEO, "Consent Order" (April 13, 2011).[1] The 2011 consent order required, among other things, that the Bank and SunTrust Mortgage retain an independent consultant to conduct a review of certain residential mortgage loan foreclosure actions or proceedings for borrowers who had a pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010 for loans serviced by SunTrust Mortgage (the "Independent Foreclosure Review").

The 2011 consent order further required that the independent consultant prepare a written report (the "Foreclosure Report") detailing the findings of the Independent Foreclosure Review. Within forty-five days of receipt of the Foreclosure Report, the Bank and SunTrust Mortgage would be required to submit to the Federal Reserve a plan to remediate errors or deficiencies in foreclosures as found in the Independent Foreclosure Review. Based on the findings of the Foreclosure Report, the plan also would provide for appropriate reimbursement to borrowers for any impermissible or otherwise unreasonable penalties, fees or expenses, or for other financial injury.

The final paragraph of the 2011 consent order stated that "[n]othing in this order, express or implied, shall give to any person or entity, other than the parties hereunder, and their successors

---

[1]Introduced and admitted as evidence at the hearing as debtors' exhibit 4.

hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order." 2011 consent order.

On June 23, 2011, a second foreclosure proceeding (the "second foreclosure action") was initiated by SunTrust Mortgage against the debtors' property at 3825 Sweetbriar Road, Wilmington, North Carolina. The foreclosure sale in this action occurred on November 8, 2011. SunTrust Mortgage was the highest bidder, in the amount of $172,400.00, and was subsequently transferred the property by trustee's deed. The debtors do not dispute the validity of this foreclosure.

On January 7, 2013, the Federal Reserve and the U.S. Office of the Comptroller of the Currency (the "OCC") issued a joint press release announcing that they had reached an agreement with ten mortgage servicing companies which had been subject to enforcement actions initiated in April 2011. The agreement provided for payment by the mortgage loan companies of more than $8.5 billion in cash payments and other assistance to help borrowers. SunTrust was one of the servicers participating in the settlement agreement. The press release described the settlement agreement as resolving the Independent Foreclosure Review requirement of the enforcement actions. According to the press release, the settlement agreement was to replace the Independent Foreclosure Review with a broader framework allowing eligible borrowers to receive compensation significantly more quickly. Borrowers would not be required to execute a waiver of any legal claims they may have against their servicer as a condition for receiving payment, and the servicers' internal complaint process would remain available to borrowers.

On January 25, 2013, the debtors filed their bankruptcy petition.

The settlement between the SunTrust entities and the Federal Reserve, which was alluded to in the January 7, 2013 joint press release, was officially entered into via consent order on

February 28, 2013 (the "2013 consent order").[2]

Specifically, the 2013 consent order amended the obligations of the Bank and SunTrust Mortgage with regards to the Independent Foreclosure Review. Instead of conducting the Independent Foreclosure Review, the Bank and SunTrust Mortgage would make a cash payment of $62,555,947 to a qualified settlement fund for distribution to the "In-Scope Borrower Population" in accordance with a distribution plan developed by the Federal Reserve and the OCC in their discretion. The "In-Scope Borrower Population" consisted of the population the Independent Foreclosure Review was meant to target: i.e., borrowers who had a pending or complete foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010, for loans serviced by SunTrust Mortgage. The first foreclosure action by SunTrust Mortgage was commenced, and therefore pending in September 2009, before being dismissed in December 2009.

The 2013 consent order further states that the amount of any payments to borrowers made pursuant to this Amendment to the 2011 Consent Order does not in any manner reflect specific financial injury or harm that may have been suffered by borrowers receiving payments. Further, the payments do not constitute an admission or denial by the SunTrust entities of wrongdoing or a civil money penalty under 12 U.S.C. § 1818(i). Finally, the 2013 consent order reiterated the final paragraph of the 2011 consent order (which in turn stated that nothing in the order gave any legal

---

[2]On July 31, 2013, the trustee submitted a memorandum of supplemental authorities to the court. In his memorandum, the trustee states that the agreement between the Federal Reserve, the OCC, and the various mortgage servicing companies announced in the press release issued on January 7, 2013 is an actual signed agreement, which was entered into on January 7, 2013. The trustee further argues that the 2013 consent order merely further memorializes this written, signed agreement of January 7, 2013. However, the trustee was unable to obtain a copy of the written agreement of January 7, 2013, and the details of that agreement are not known to the court except for what is reported in the press release. As no January 7, 2013 written agreement is before the court, the court will not consider it in making its determination.

or equitable rights to any third parties) in its entirety. The 2013 consent order also inserted the following language at the beginning of that paragraph:

> In no event shall SunTrust, the Bank, or SunTrust Mortgage request or require any borrower to execute a waiver of any claims against SunTrust, the Bank, or SunTrust Mortgage (including any agent of SunTrust, the Bank, or SunTrust Mortgage) in connection with any payment of Foreclosure Prevention assistance provided pursuant to paragraphs 3 or 4 of this Order. However, nothing herein shall operate to bar SunTrust, the Bank, or SunTrust Mortgage from asserting in the future in any separate litigation, or as part of a settlement related to SunTrust's, the Bank's, or SunTrust Mortgage's foreclosure and servicing practices, any right that may exist under applicable law to offset the amounts received by a borrower through the distribution process set forth above. Nothing herein shall operate to amend or modify in any respect any preexisting settlement between SunTrust, the Bank, SunTrust Mortgage, or any of their affiliates and a borrower in the In-Scope Borrower Population.

In re SunTrust Banks, Inc., SunTrust Bank, and Suntrust Mortgage, Inc., Docket No. 11-021-B-HC/SM/DEO, "Amendment of Consent Order" (February 28, 2013).[3]

On March 18, 2013, the debtors received a postcard from Rust Consulting Inc., the paying agent retained pursuant to the 2013 consent order. The postcard informed the debtors that they may be entitled to compensation related to a foreclosure action. The debtors checked a box on the postcard and returned it to Rust Consulting. On April 12, 2013, the debtors received a letter from Rust Consulting, along with a check for $25,000.00. The amount of the payment, which related to the settlement agreement between the SunTrust entities and the Federal Reserve System, was based on the stage of the foreclosure process and other considerations related to the debtors' foreclosure. The letter stated that the deposit of the check would not waive any legal claims against the mortgage service, and that the debtors still could pursue additional actions related to the foreclosure. The letter reiterated that the payment did not mean that the debtors suffered financial injury or harm.

---

[3]Introduced and admitted as evidence at the hearing as debtors' exhibit 3.

The debtors signed the check over to their bankruptcy counsel's trust account.

The final decree was entered in the debtor's chapter 7 case and the case was closed, on May 6, 2013. The following day, May 7, 2013, counsel for the debtors informed the trustee of the $25,000.00 payment. The check was deposited into the trust account on May 8, 2013. On May 17, 2013, the debtors amended their schedules B and C to disclose the payment as trustee had directed. On May 22, 2013, the trustee moved to reopen the case to administer the asset.

## DISCUSSION

The filing of a debtor's petition in bankruptcy commences a bankruptcy case and creates the bankruptcy estate. 11 U.S.C. §§ 301, 541.[4] With the exceptions enumerated in § 541, the bankruptcy estate consists of all of the debtor's legal and equitable interests that existed as of the commencement of the case. 11 U.S.C. § 541(a)(1). However as noted in Collier on Bankruptcy,

> [t]he status of property acquired by an individual following the filing of the bankruptcy case is not always clear. Under section 541(a)(6), proceeds, product, etc., of property of the estate are part of the estate, while "earnings from services performed by an individual debtor" are not. On the other hand, "[a]ny interest in property that the estate acquires after the commencement of the case" is included in "property of the estate" by section 541(a)(7). *By obvious implication, property acquired postpetition by an individual debtor is usually not property of the estate.*

5 Collier on Bankruptcy ¶541.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed., 2012) (emphasis added). The burden of proving that property is not part of the bankruptcy estate is on the debtor. In re Poffenbarger, 281 B.R. 379, 385 (Bankr. S.D. Ala. 2002); In re Lemos, 243 B.R. 96,

---

[4]While § 541 creates the estate, nothing in title 11 "answers the threshold questions of whether a debtor has an interest in a particular item of property and, if so, what the nature of that interest is." In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988). If there is a question as to the existence and nature of a debtor's, and hence the estate's, interest in property, it must be determined by nonbankruptcy law. Id. Typically, that law is state law. Butner v. United States, 440 U.S. 48, 55 (1979).

7

98 (Bankr. D. Idaho 1999) (citing Johnson v. Taxel (In re Johnson), 178 B.R. 216, 220-21 (9th Cir. BAP 1995)).

When an individual debtor receives property postpetition, the determination of whether the property is property of the estate turns on whether the postpetition property is "sufficiently rooted in the prebankruptcy past." Segal v. Rochelle, 382 U.S. 375, 380 (1966); see Andrews v. Riggs Nat'l Bank (In re Andrews), 80 F.3d 906, 908 (4th Cir. 1996); see also In re Jenkins, 410 B.R. 182, 189-190 (Bankr. W.D.Va. 2008) (discussing the continued validity of the Segal test following the passage of the Bankruptcy Code). In Segal, the question was whether a loss-carryback tax refund claim was part of the bankruptcy estate, where the loss underlying the refunds occurred prepetition but the refund was issued postpetition. 382 U.S. at 376-77. The Court held that the refund was property of the estate because "it was sufficiently rooted in the prebankruptcy past." Id. at 380. Thus, if payments are rooted in prepetition conduct, such payments can be considered property of the estate. Jenkins, 410 B.R. at 189.

Here, the debtors' bankruptcy case commenced on January 25, 2013, when the debtors filed their voluntary chapter 7 petition. The $25,000.00 was received postpetition on April 12, 2013. If the debtor held a legal or equitable interest in the property at the commencement of the case, the payment is property of the estate. Or, stated in terms of the Segal test, if the postpetition payment of $25,000.00 was sufficiently rooted in the prepetition past, then that payment is property of the estate. The court concludes that in this case, it is not.

Although the debtors' qualification to receive the payment is based upon the first foreclosure action, initiated on September 17, 2009 and dismissed on December 14, 2009, the payment was not sufficiently rooted in that action as to render the payment property of the estate. While a bankruptcy

8

estate includes "causes of action" belonging to the debtor at the time the case is commenced, In re Hamlett, 304 B.R. 737, 740 (Bankr. M.D.N.C. 2003), that analysis is inapplicable here because there is no indication that the debtors were wrongfully foreclosed upon or have some other cause of action against SunTrust Mortgage.  The 2013 consent order and the letter the debtors received with the payment explicitly state that the payment is in no way an admission of liability or wrongdoing on SunTrust Mortgage's behalf, nor does acceptance of the payment by the debtors foreclose their ability to bring a cause of action against SunTrust Mortgage.  Furthermore, the foreclosure action which made the debtors eligible as part of the In-scope Borrower Population was voluntarily dismissed without prejudice.  The actual completed foreclosure, initiated on June 23, 2011, did not occur within the dates targeted by the enforcement action: January 1, 2009 to December 31, 2010.  Neither of the foreclosure actions have been alleged to have been deficient in any manner.  Ultimately, the SunTrust entities, possibly for their own convenience, decided to forego the Independent Foreclosure Review that would have identified specific deficient foreclosure actions, and opted instead to make blanket payments to the entire In-scope Borrower Population.  Therefore, the $25,000.00 payment was not related to a cause of action held by the debtors at the time of the commencement of the bankruptcy case.

     Nor did the 2011 consent order create any interest of the debtors sufficient, to root the payment in prepetition conduct.  The 2011 consent order contains no indication that these specific debtors would be entitled to anything.  The purpose of the Independent Foreclosure Review was to identify the deficient foreclosures.  Pursuant to its terms, foreclosure deficiencies affecting members of the class of borrowers defined only by the date of the foreclosure were required to be shown.  There are no allegations that the first foreclosure action was deficient or that the debtors were in any

9

way harmed, so had the Independent Foreclosure Review been initiated and completed in accordance with its stated purpose, there is no indication that the debtors would have received compensation.[5]

The only other instance of prepetition conduct which could possibly root the payment is the joint press release issued January 7, 2013. However, nothing in the release entitled the debtors to any payment or gave them enforceable rights against the SunTrust entities. The release contained no details of the agreement between SunTrust and the Federal Reserve, and did not address whether such agreement entitled all foreclosed parties to payments. The settlement agreement was entered into, and its terms thus were fixed, postpetition, on February 28, 2013.

In sum, the court finds that none of the prepetition events sufficiently rooted the postpetition payment such to render the payment property of the estate. The payment stemmed from the 2013 consent order; however, even at the time that the 2013 consent order was entered, there is no

---

[5]The trustee's argument that the debtors had a contingent interest in the payment at the time of filing is unconvincing. In In re Edmonds, 273 B.R. 527 (Bankr. E.D. Mich. 2000), a profit-sharing check received postpetition was property of the estate because the debtor held a contingent interest, as of the petition date, in any profit sharing paid to Ford's employees for the 1999 year. In order to receive a distribution, Ford simply had to make a profit and the employee had to be on Ford's employment rolls on December 31, 1999. Id. Here, at the time of filing, SunTrust was to conduct an Independent Foreclosure Review identifying deficient foreclosures and submit a compensation scheme to the Federal Reserve for approval. Payments then would be made at the Federal Reserve's discretion, after it approved SunTrust's proposed plan of reimbursement. This is quite different from the contingency in Edmonds. Further, at all times prepetition, a finding that the particular foreclosure was deficient was required in order to require any compensation. As there is no indication that the debtors' foreclosure proceedings were in any way deficient, they would have at most had a "mere hope" of any sort of payment. This case is more similar to the crop disaster payment cases which the trustee cites as distinguishable from the case at hand. See In re Bracewell, 322 B.R. 698 (Bankr. M.D. Ga. 2005).

10

indication that the debtors were entitled, legally or equitably, to the payment.[6]  The language of both the 2011 consent order and the 2013 consent order specifically state that nothing in the orders gives any person other than the parties to the orders any benefit, or any legal or equitable right, remedy, or claim under the orders.[7]  The express statements in the consent orders that they do not create rights in any other parties clearly show explicitly that it was not the intent of the parties to create rights in third-parties.  As such, there is no indication that the debtors had rights to the payment, enforceable against the SunTrust entities, at any time prepetition, or prior to their receipt of the check.

## CONCLUSION

Based on the foregoing, the court concludes that the debtors did not have an interest in the $25,000.00 payment at the commencement of the case and, as such, said payment is not property of the estate.  The trustee's objection to the debtors' amended exemption is accordingly **OVERRULED**.

## END OF DOCUMENT

---

[6]At the hearing, counsel for the debtor out of an abundance of caution argued that in addition to not being an interest in property held by the debtors at the commencement of the case, the $25,000.00 also was not a bequest, devise, or inheritance.  Counsel for the debtor suggested that in fact the payment was a "gift."  While the court need not decide what, in fact, the payment was, aside from determining that it is not property of the estate, the court suggests that the payment could be referred to as a "windfall."

[7]In North Carolina, and most jurisdictions, to assert rights under a contract as a third-party beneficiary, a person must show, among other things, that the contract was executed for the direct, and not incidental, benefit of that person.  Michael v. Huffman Oil Co., 661 S.E.2d 1, 10 (N.C. Ct. App. 2008); Raritan River Steel Co. v. Cherry, Bekaert & Holland, 407 S.E.2d 178, 182 (N.C. 1991) (if no intent to benefit is found, then beneficiary of agreement made by others is considered an incidental beneficiary who does not have right of action on that agreement).